IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


JONATHAN B. BOLTJES, )
 )
                              Plaintiff, )
 )
        vs. )
 )
CAROLYN W. COLVIN, acting )
Commissioner of Social Security, )
 )                    No. 1:14-cv-0010-HRH
                              Defendant. )
_____)


O R D E R

This is an action for judicial review of the denial of disability benefits under Title II

and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1383f.  Plaintiff has

timely filed his opening brief,[1] to which defendant has responded.[2] Oral argument was not

requested and is not deemed necessary.

Procedural Background

Plaintiff is Jonathan B. Boltjes.  Defendant is Carolyn W. Colvin, acting  Commis-

sioner of Social Security.

_____

[1]Docket No. 14.

[2]Docket No. 15.

-1-

On September 27, 2011, plaintiff filed applications for disability benefits under Titles II and XVI of the Social Security Act. Plaintiff alleged that he became disabled on April 1, 2000. Plaintiff alleged that he is disabled because of a bipolar disorder with psychotic features, schizophrenia, a learning disability and because he hears voices and hallucinates. Plaintiff's applications were denied initially and upon reconsideration. After a hearing on May 15, 2013, an administrative law judge (ALJ) denied plaintiff's claims. On June 5, 2014, the Appeals Council denied plaintiff's request for review, thereby making the ALJ's June 12, 2013 decision the final decision of the Commissioner. On July 17, 2014, plaintiff commenced this action in which he asks the court to find that he is entitled to disability benefits.

## General Background

Plaintiff was born on October 17, 1982. Plaintiff was 30 years old at the time of the hearing. Plaintiff has a high school education. Plaintiff was in special education throughout school. Plaintiff's past relevant work includes work as a dishwasher, a hand packer, a bagger, a laborer/landscaper, and a coffee shop cashier.

## The ALJ's Decision

The ALJ first determined that plaintiff met "the insured status requirements of the Social Security Act through September 30, 2013."[3]

---

[3]Admin. Rec. at 14.

The ALJ then applied the five-step sequential analysis used to determine whether an individual is disabled.[4]  At step one, the ALJ found that plaintiff had "not engaged in substantial gainful activity since April 1, 2000, the alleged onset date...."[5]

At step two, the ALJ found that plaintiff had "the following severe impairment[s]: bipolar disorder, schizoaffective disorder, and substance abuse...."[6]  The ALJ found that plaintiff's learning disorder was not a severe impairment because "[t]he evidence is simply

---

[4]The five steps are as follows:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
> Step two: Is the claimant's alleged impairment sufficiently severe to limit ... h[is] ability to work? If so, proceed to step three.  If not, the claimant is not disabled.
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform ... h[is] past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow ... h[im] to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

[5]Admin. Rec. at 14.

[6]Admin. Rec. at 14.

insufficient to find that any learning disorder, if it actually is a medical determinable impairment, is a severe impairment."[7] The ALJ also found that plaintiff's psoriasis was not a severe impairment because "medical notations revealed that this impairment responded well to the use of topically applied corticosteroids."[8] And, the ALJ found that plaintiff's personality disorder NOS was not a severe impairment because there was a lack of support for such a diagnosis.[9]

At step three, the ALJ found that plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1...."[10] The ALJ specifically considered Listing 12.04 (affective disorders) and Listing 12.09 (substance addiction disorders).[11] The ALJ considered the "paragraph B" criteria and found that plaintiff had only mild restrictions in his activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and

---

[7]Admin. Rec. at 15.

[8]Admin. Rec. at 15.

[9]Admin. Rec. at 15.

[10]Admin. Rec. at 15.

[11]Admin. Rec. at 15.

one to two episodes of decompensation, each of extended duration.[12] The ALJ considered

whether the "paragraph C" criteria were satisfied. The ALJ found that "the evidence

fail[ed] to establish the presence of the 'paragraph C' criteria for a schizoaffective disorder

under medical listing 12.02 and a bipolar disorder under medical listing 12.04"[13] because

> [t]he evidence failed to establish that the claimant had repeated
> episodes of decompensating; the evidence failed to establish
> such marginal adjustment that a minimal increase in mental
> demands or change in environment would be expected to
> cause decompensation; and the evidence did not establish an
> inability to function outside of a highly supportive living
> arrangement.[14]

"Between steps three and four, the ALJ must, as an intermediate step, assess the

claimant's RFC." Bray v. Comm'r Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009).

The ALJ found that plaintiff had

> the residual functional capacity to perform a full range of work
> at all exertional levels but with the following nonexertional
> limitations: work limited to one to two step tasks which are
> simple, routine, and repetitive in a low stress job, that is
> defined as having only occasional decision-making required
> and only occasional changes in the work setting.[15]

---

[12]Admin. Rec. at 16.

[13]Admin. Rec. at 16.

[14]Admin. Rec. at 16.

[15]Admin. Rec. at 17.

The ALJ found plaintiff's testimony as to his symptoms less than credible because plaintiff had "admitted to feigning symptoms to achieve a desired result[;]" because medical sources suggested that plaintiff was not entirely credible; and because of his failure to comply with treatment.[16] The ALJ give little weight to the opinion of Dr. Fineman[17] because he "failed to provide objective medical findings to support the degree of limitation that he alleged."[18] The ALJ gave some weight to Dr. Feigin's[19] opinion.[20]

The ALJ considered the lay testimony of Lillian Brock, plaintiff's mother,[21] but found that "her description of plaintiff's life at her home prior to leaving in March 2013 indicated that he was able to do tasks if he needed to do so."[22] The ALJ also considered the lay testimony of Rev. Travers[23] but did not give much weight to this testimony as "Rev.

---

[16]Admin. Rec. at 18-19.

[17]Dr. Fineman treated plaintiff at the Juneau Alliance for Mental Health, Inc. in 2012 and 2013. Admin. Rec. at Admin. Rec. at 427-430 & 436-441.

[18]Admin. Rec. at 19.

[19]Ron Feigin M.D. was a nonexamining source who reviewed plaintiff's case on January 21, 2012. Admin. Rec. at 361-371.

[20]Admin. Rec. at 19.

[21]Plaintiff's mother submitted a third-party function report on April 16, 2013. Admin. Rec. at 209-216.

[22]Admin. Rec. at 20.

[23]On May 3, 2013, Patrick J. Travers, the pastor at Saint Paul the Apostle Catholic
(continued...)

Traver[s] admitted that he had lost contact with [plaintiff] for about 10 years prior to 2007"

and because Rev. Travers "has no particular expertise in making" determinations about

plaintiff's ability to live independently or to be employed.[24]

At step four, the ALJ found that plaintiff "is capable of performing past relevant

work as a laborer/landscaper, bagger/hand packager, coffee shop cashier, and

dishwasher."[25]  The ALJ's finding was based on the testimony of the vocational expert.[26]

Thus, the ALJ found that plaintiff had "not been under a disability, as defined in the

Social Security Act, from April 1, 2000, through the date of this decision...."[27]

<u>Standard of Review</u>

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of

the Commissioner...."  The court "properly affirms the Commissioner's decision denying

benefits if it is supported by substantial evidence and based on the application of correct

---

[23](...continued)
Church, submitted a letter in support of plaintiff's disability application.  Admin. Rec. at 217-218.

[24]Admin. Rec. at 20.

[25]Admin. Rec. at 20.

[26]Admin. Red. at 20.  Daniel Labrosse testified as the vocational expert at the hearing. Admin. Rec. at 59-62.

[27]Admin. Rec. at 21.

legal standards." <u>Sandgathe v. Chater</u>, 108 F.3d 978, 980 (9th Cir. 1997). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Id.</u> (quoting <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995)). "'To determine whether substantial evidence supports the ALJ's decision, [the court] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" <u>Id.</u> If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision. <u>Id.</u> But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'" <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999)).

Discussion

Plaintiff first argues that the ALJ erred at step three. At step three, the ALJ found that plaintiff's mental impairments, when considered either individually or in combination, did not meet or medically equal one of the listed impairments. Plaintiff argues that this was error because the ALJ did not consider the opinion of a medical expert on the issue of medical equivalency. Plaintiff's argument is based on 20 C.F.R. § 404.1526(c) and SSR 96-6p. Section 404.1526(c) provides that the ALJ must "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner" when

deciding whether a claimant's impairments medically equal a listed impairment. SSR 96-6p explains that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."

The only opinion in the record by a psychological consultant designated by the Commissioner was that of Dr. Feigin. Dr. Feigin wrote that this is a

> [c]hallenging case. Record clearly indicates clmt responds to appropriate meds (last hospitalization 8/11 shows improve-ment in GAF over 10 days from a 20 to a 60). He quickly stopped meds on discharge as he has done in past and re-turned to abuse of alcohol and cannabis. It is not clear to what degree illness interferes with decision making but drug seeking for BDZs and question of malingering for housing and benefits with c/o Sxs is noted. I suspect with adherence to TX and sobriety he would be at least a voc denial, however, without third party ADL's and/or work history there's not enough evidence to make a decision.[28]

Because the only state agency consultant opined that the evidence was insufficient to make any determinations, the ALJ had no state agency medical consultant opinion on the issue of equivalency to consider. This is contrary to the requirement of 20 C.F.R. § 404.1526(c). In addition, Dr. Feigin reviewed the record in January 2012. SSR 96–6p requires the ALJ to obtain an updated medical expert opinion if, "in the opinion of the administrative law

---

[28]Admin. Rec. at 371.

judge" additional medical evidence may change the state agency consultant's finding on equivalence. A significant amount of medical evidence post-dated Dr. Feigin's review,[29] including two third-party function reports,[30] the very evidence that Dr. Feigin suggested would helpful in this case. Pursuant to SSR 96-6p, the ALJ should have obtained an updated medical expert opinion.

The lack of a medical expert opinion as to equivalency also triggered the ALJ's duty to fully and fairly develop the record. Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005). This duty is triggered "when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 276 F.3d 453, 459–60 (9th Cir. 2001). Here, because there was no state agency consultant's opinion on equivalence, the record was inadequate for a proper evaluation at step three.

Plaintiff next argues that the ALJ erred in giving little weight to Dr. Fineman's opinion. Dr. Fineman opined that plaintiff had limited but satisfactory ability to remember work-like procedures and understand, remember, and carry out very short and simple

---

[29]After the August 2011 admission referred to by Dr. Feigin, plaintiff had seven additional admissions to the Mental Health Unit at Bartlett Regional Hospital. Admin. Rec. at 379, 445-447, 468-473, 490, 500, 510 & 601.

[30]Both plaintiff's mother and Rev. Travers submitted their reports after Dr. Feigin had reviewed the record.

instructions.[31]  Dr. Fineman opined that plaintiff's ability to make simple work-related decisions, ask simple questions or request assistance, be aware of normal hazards and take appropriate precautions, and use public transpiration was seriously limited.[32] Dr. Fineman opined that plaintiff's ability to maintain attention for two hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; understand, remember, and carry out detailed instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled or skilled work; interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; and travel to unfamiliar places would not meet competitive

---

[31]Admin. Rec. at 594.

[32]Admin. Rec. at 594-595.

standards.[33] Dr. Fineman opined that plaintiff had none to mild restriction of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompensation within a 12 month period, each lasting at least 2 weeks.[34] Dr. Fineman also opined that plaintiff would miss more than four days of work per month.[35] Dr. Fineman noted that plaintiff "does have a history of substance abuse, but the limits set forth ... are valid when he is not using substances."[36]

Dr. Fineman was a treating source. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). "[W]here the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons." Id. (quoting Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)).

The ALJ give little weight to the opinion of Dr. Fineman because he "failed to provide objective medical findings to support the degree of limitation that he alleged."[37] Plaintiff argues that this was not a clear and convincing reason to reject Dr. Fineman's

---

[33]Admin. Rec. at 594-595.

[34]Admin. Rec. at 596.

[35]Admin. Rec. at 597.

[36]Admin. Rec. at 597.

[37]Admin. Rec. at 19.

opinion because Dr. Fineman's treatment notes, which were submitted separately from his opinion, provide objective findings to support Dr. Fineman's opinion. Plaintiff also points out that Dr. Fineman had access to plaintiff's past treatment notes[38] which plaintiff contends provide support for Dr. Fineman's opinion.

There are four treatment notes in the record from Dr. Fineman. On May 3, 2012, Dr. Fineman's mental status exam showed that plaintiff

> was quite cooperative and friendly today in the interview without such dramatic types of behaviors as have at times been present in the past. He complains of his mood being mainly anxious. He says he has ongoing auditory hallucinations and visual hallucinations for which medications do not help. He does have chronic suicidal ideation but presently low intent to act on this. There is no homicidal ideation. There was no psychomotor agitation. Speech was normal rate and rhythm and well organized.[39]

Dr. Fineman's assessment was that plaintiff "seems to be doing fairly well and says he is off alcohol and substances."[40]

On May 30, 2012, Dr. Fineman's mental status exam showed that plaintiff

> was fairly calm and cooperative with the interview, not in anyway acting in a threatening manner. His speech was normal rate and rhythm and well organized. Affect is some- what restricted in range. He has chronic auditory and visual

---

[38]Admin. Rec. at 436.

[39]Admin. Rec. at 438.

[40]Admin. Rec. at 438.

hallucinations, for which medications have not helped. Suicidal ideation presently is at a very low level for him. There was no homicidal ideation. He was not agitated during the interview.[41]

Dr. Fineman's assessment was that plaintiff "presents quite stable compared to some past notes. He needs to workout with Rainforest getting back into their groups."[42]

On January 18, 2013, Dr. Fineman's mental status exam showed that plaintiff was

polite and cooperative with the interview. He was not at all irritable. Speech was normal rate and rhythm and well-organized. Mood clearly fluctuates quite a lot but did not appear to be in either manic or severely depressed state presently. He does describe chronic auditory and visual hallucinations and medications have never helped much for that, but then he has never persisted with medications. He does not have any suicidal intent or plan presently and there is no homicidal ideation. There was no psychomotor agitation.[43]

On February 15, 2013, Dr. Fineman's mental status exam showed that plaintiff was

again polite, friendly and cooperative. His mood appears neutral. Affect was appropriate to content and full range. Speech was normal rate and rhythm and well organized. There were no suicidal or homicidal ideations revealed and no psychotic symptoms. He does have a history of chronic auditory and visual hallucinations but did not describe them

---

[41]Admin. Rec. at 436.

[42]Admin. Rec. at 436.

[43]Admin. Rec. at 429.

today. There was no psychomotor agitation.[44]

These treatment notes do not support the extreme functional limitations that Dr. Fineman opined plaintiff had. Rather, they show that during the time Dr. Fineman was providing medication management for plaintiff, plaintiff was doing fairly well. Thus, the ALJ did not err in giving Dr. Fineman's opinion only a little weight.

Plaintiff next argues that the ALJ erred in finding his symptom statements less than credible. "An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014). "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). "In this analysis, the claimant is not required to show 'that h[is] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it could reasonably have caused some degree of the symptom.'" Id. (quoting Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996)). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" Id. (quoting Smolen, 80 F.3d at 1281). "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, 'the ALJ can

---

[44]Admin. Rec. at 427.

reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" Id. at 1014-15 (quoting Smolen, 80 F.3d at 1281). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" Id. at 1015 (quoting Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)). "In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Turner v. Comm'r of Social Sec., 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)). "For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.]" Id. (internal citations omitted).

The ALJ found plaintiff's statements less than credible because plaintiff had "admitted to feigning symptoms to achieve a desired result[;]" because medical sources suggested that plaintiff was not entirely credible; and because of plaintiff's failure to comply with treatment.[45] The parties disagree as to whether these were clear and convincing reasons.

The first reason given by the ALJ was clear and convincing. There is evidence in the

---

[45]Admin. Rec. at 18-19.

record that plaintiff faked symptoms to achieve a desired result. For example, on August

25, 2011, a clinician from JAMHI noted that plaintiff's

> [j]udgment is poor but less in the sense that he might legiti-
> mately harm himself and more in the sense that he may
> confabulate and manipulate to reach an outcome that is not
> genuinely necessary. Dr. Pappenheim reports that he has
> recent memory and familiarity with this patient and his alleged
> symptoms and is highly confident they are hyperbole or
> confabulation.[46]

During plaintiff's December 8-18, 2011 hospitalization, a "JAMHI worker found that

[plaintiff] wished to be an inpatient in the hospital during the time that he should be

reporting for a court date."[47] And, on June 24, 2012, plaintiff "admitted the reason he

claimed he was suicidal and had hallucinations was to get away from Polaris House

because of a conflict with one of the attendants."[48]

The second reason given by the ALJ was also clear and convincing. There is

evidence in the record that medical sources thought that plaintiff was not entirely credible.

For example, on August 25, 2011, it was noted that "[r]ecent evaluators have been

concerned that the patient may be malingering and none have felt that he is seriously at

_____

[46]Admin. Rec. at 307.

[47]Admin. Rec. at 454.

[48]Admin. Rec. at 513.

risk for self-harm or harm to others."[49] And, on June 29, 2012, Dr. Engelman noted that plaintiff "will manipulate in anyway including lying about being suicidal to get into the MHU and get on drugs."[50]

As for the third reason, that he failed to comply with treatment, plaintiff argues that the ALJ ignored the evidence that indicates that he has a very poor memory and forgets to take his medication.[51] An inadequately explained failure to follow prescribed courses of treatment is a proper reason to find pain and symptom statements less than credible. Molina v. Astrue, 674 F.3d 1104, 1112–13 (9th Cir. 2012). But because plaintiff explained why he has not been compliant, this was not a convincing reason to find plaintiff's statements less than credible. This error, however, was harmless. Because the other two reasons given by the ALJ were clear and convincing, there was still substantial evidence to support the ALJ's credibility finding. Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162–63 (9th Cir. 2008) (holding that an erroneous basis for an ALJ's credibility determination is harmless error if other valid reasons support that determination).

Finally, plaintiff argues that the ALJ erred in giving little weight to Rev. Travers' testimony. Rev. Travers explained that he first met plaintiff in 1994, lost contact with

---

[49]Admin. Rec. at 311.

[50]Admin. Rec. at 434.

[51]Admin. Rec. at 390.

plaintiff from 1997-2007, but has seen him on numerous occasions since late 2007.[52]  Rev.

Travers reported that plaintiff

> has always been very pleasant and respectful, but almost
> completely unable to focus on any topic of meaningful conver-
> sation.  He has had a very difficult time functioning at school
> and at work, and in fulfilling ordinary responsibilities and
> necessities of life.  This has not surprised me in light of his
> demonstrated inability to concentrate during our conversa-
> tions.  His inability to function in daily life has led him into a
> situation of chronic homelessness.  He has, over the past two
> years, spent a great deal of time living in a tent on the streets.
> When this becomes intolerable, he either checks into the mental
> health unit at Bartlett Memorial Hospital or stays with his
> mother, Lillian....  Jonathan has had considerable contact with
> the criminal justice system....
>
> I know that Jonathan wants to change his attitudes and
> behavior, and has tried to do this repeatedly over the course of
> his life, but to no avail.  I truly believe that he will never be able
> to perform well in any significant employment, and that he will
> always be heavily dependent on others and on the social
> service system for his very survival.  He is a person badly in
> need of protection from himself and from the bad influence of
> others.  In a highly structured living situation he might be able
> to live happily and safely, but I do not believe that he will ever
> have the capacity to live independently or to support himself
> through regular employment.[[53]]

The ALJ considered this testimony but did not give it much weight because "Rev.

Traver[s] admitted that he had lost contact with [plaintiff] for about 10 years prior to 2007"

and because Rev. Travers "has no particular expertise in making" determinations about

---

[52]Admin. Rec. at 217.

[53]Admin. Rec. at 217.

plaintiff's ability to live independently or to be employed.[54] "An ALJ may reject a lay witness's testimony only 'upon giving a reason germane to that witness.'" Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014) (quoting Parra v. Astrue, 481 F.3d 742, 750 (9th Cir. 2007)).

The fact that Rev. Travers had lost contact with plaintiff for a period of time is not relevant to Rev. Travers' observations of plaintiff during the recent past. Rev. Travers stated that he had been in contact with plaintiff since 2007, or in other words, for the past six years. Six years is an adequate period of time on which to base an opinion.

The ALJ also discounted Rev. Travers' testimony because he did not have any particular expertise in making determinations about plaintiff's ability to live independently or to work. However, this is not a valid reason to reject lay testimony. Bruce v. Astrue, 557 F.3d 1113, 1116 (9th Cir. 2009).

Although the ALJ erred as to Rev. Travers' testimony, this error was harmless because Rev. Travers' testimony is similar to plaintiff's, which the ALJ properly found to be less than credible. See Valentine v. Comm'r Social Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (holding that if an ALJ gave germane reasons for rejecting the claimant's testimony, those reasons are equally germane to similar testimony by a lay witness).

Because the ALJ erred at step three, the court must consider whether to remand this

---

[54]Admin. Rec. at 20.

case for further proceedings or for an award of benefits. "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." <u>Benecke v. Barnhart</u>, 379 F.3d 587, 593 (9th Cir. 2004) (emphasis omitted). A remand for further proceedings is appropriate here because the record needs to be developed more fully. What is missing is a medical opinion as to equivalency.

<u>Conclusion</u>

The Commissioner's decision is reversed and this matter is remanded for further proceedings.

DATED at Anchorage, Alaska, this 17th day of March, 2015.

/s/ H. Russel Holland
United States District Judge